UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 3:08-cv-00914 (DJS) |
| | : | |
| $829,422.42 IN UNITED STATES | : | |
| CURRENCY SEIZED FROM ACCOUNT | : | |
| NUMBER 202252771 AT CITIBANK, | : | |
| N.A., HELD IN THE NAME OF | : | |
| WESTERN LIABILITY MANAGEMENT, | : | |
| INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |
| [CLAIMANT: WESTERN LIABILITY | : | |
| MANAGEMENT, INC.] | : | |

MEMORANDUM OF DECISION AND ORDER

The Plaintiff, the United States of America ("the

Plaintiff"), brings this civil action *in rem* against the

Defendant, $829,422.42 in United States currency ("the Defendant

Currency"), alleging that the Defendant Currency is subject to

forfeiture because it was involved in certain illegal conduct,

namely, the operation of an unlicensed money transmitting

business affecting interstate and foreign commerce in violation

of 18 U.S.C. § 1960[1] ("Section 1960").  Western Liability

Management, Inc. ("the Claimant" or "WLM") has a claim of

---

[1] Although the Plaintiff's Verified Complaint of Forfeiture also
alleges involvement in money laundering in violation of 18
U.S.C. § 1956, the Plaintiff's motion addresses only the alleged
violation of 18 U.S.C. § 1960, i.e., the operation of an
unlicensed money transmitting business.

1

interest in the Defendant Currency and seeks the return of the currency.  Now pending before the Court are the Claimant's Motion for Summary Judgment and the Plaintiff's Motion to Dismiss WLM's claim, or in the alternative, for Summary Judgment. For the reasons stated below, the Claimant's Motion for Summary Judgment **(dkt. # 70)** is denied, and the Plaintiff's Motion to Dismiss, or in the alternative, for Summary Judgment **(dkt. # 81)** is granted.

## I.   FACTS

Many of the facts set forth in the Plaintiff's Local Rule 56(a)(1) Statement cite to the affidavit of Debra Lee, an Internal Revenue Service Special Agent assigned to the investigations pertinent to this action. In its Local Rule 56(a)(2) Statement, the Claimant denies the facts that refer to the Lee affidavit - - not on the basis that there is a genuine dispute as to those facts, but on the basis that the Lee affidavit "is not made based upon personal knowledge, does not set forth facts that would be admissible in evidence, and does not show that Ms. Lee is competent to testify on the matters stated." (See e.g., doc. # 85-2, at 3, ¶ 12). The Court does not find the Claimant's position on the Lee affidavit to be well-

founded. [2]

As noted by the Plaintiff, the information contained in both the Verified Complaint and the Lee affidavit are based on information learned by Lee as the result of her involvement in the investigations pertinent to this action. As further noted by the Plaintiff, the extent of Lee's personal involvement in the investigations was explored during the course of her deposition by counsel for the Claimant. With reference to the affidavit in question, Lee testified that "a lot of the facts of the case, you can tell, were of my investigation . . . ." (Doc. # 90-3, at 5:6-7). The Court finds Lee's personal involvement and familiarity with the investigations sufficient to withstand the Claimant's challenges to the Lee affidavit. *See United States v. Birchem*, 100 F.3d 607, 610 (8th Cir. 1996)(the court rejected a challenge to the affidavit of an agency official that was "based on the information contained in the [agency's] business records," particularly since the defendants "have not pointed out any factual disputes that would preclude summary judgment").

The Court likewise finds the Claimant's other objections to evidence relied upon by the Plaintiff in its Local Rule 56(a)(1) Statement to be unfounded. Authenticity objections to documents

---

[2] To the extent that the Plaintiff's Local Rule 56(a)(2) Statement in opposition to the Claimant's motion for summary judgment relies upon the same evidentiary support, the same reasoning applies to the Claimant's objections to that Statement.

produced by the Claimant itself, authenticated by a deponent, or certified by a governmental agency will not be sustained.

In 2006, federal law enforcement officials began to investigate possible money laundering and unlicensed money remitter violations in Danbury, Connecticut and Bridgeport, Connecticut. In Bridgeport, law enforcement officials initiated an investigation of BrazUSA Enterprises LLC ("BrazUSA"), which was a travel and remittance agency. Records listed Adriana DeOliveira ("Adriana") as an agent of BrazUSA and Andrea DeOliveira ("Andrea") as a principal of the business. During the course of the investigation, law enforcement officials determined that Andrea and Alessandra DeOliveira ("Alessandra") were the principal operators of BrazUSA after Adriana was unable to re-enter the United States from Brazil in 2007. Law enforcement officials also determined that Adriana's husband, Nilander DeOliveira ("Nilander") claimed to be the true owner of BrazUSA and that BrazUSA was not registered with either the U.S. Department of the Treasury Financial Crimes Enforcement Network ("FinCen") or the State of Connecticut Department of Banking as a money services business ("MSB").

In Danbury, law enforcement officials initiated an investigation of RM Insurance Services LLC ("RM Insurance") and Marrakesh Industries ("Marrakesh"). RM Insurance was a Connecticut corporation whose listed business purpose was

4

involvement in all aspects of the sale of insurance policies and products. Renata Amaral ("Amaral") was the president of RM Insurance and Monica Texeira ("Texeira") was the vice president. The principal of Marrakesh was Texeira's brother, Americo Texeira.

During the course of the investigation, law enforcement officials determined that Amaral and Texeira had been conducting wire transfers through an account opened in the name of Marrakesh. Amaral, Texeira, and Marrakesh were not registered with the State of Connecticut Department of Banking as an MSB, nor were Amaral, Texeira, RM Insurance, or Marrakesh registered with FinCen to transfer funds on behalf of others.

Ariston DeOliveira was the sole owner of Western Liability Management, Inc. ("WLM"), a California corporation. WLM opened Citibank Account Number 202252771 in Orange County, California in 2007 for the purpose of transmitting money via wire. From at least 2007 to 2009, WLM accepted wire transfers of funds from entities in the United States into its Citibank Account Number 202252771. From at least 2007 until 2009, WLM transferred funds received from various entities in the United States into various bank accounts in the United States and abroad, using wires. From the time WLM began accepting wire transfers from various entities in the United States until June 8, 2008, WLM was not registered with FinCen as an MSB. From the time WLM began

transferring funds, via wire transfer, to various entities in the United States and abroad, until June 8, 2008, WLM was not registered with FinCen as an MSB.

**A. Bridgeport Investigation**

In May 2007, an undercover officer ("UC") transacted business with BrazUSA. The UC met with Andrea and Alessandra DeOliveira at BrazUSA and informed them that he[3] desired to have the proceeds of marijuana sales wired domestically. Upon the UC's expressed concern about his name listed on forms for the transaction, Andrea and Alessandra assured the UC that no forms would include his name, but rather, would list Andrea as the sender from her own account to an account provided by the UC. Andrea informed the UC that a middleman or "payer" completes the wire transaction to Brazil.

The first wire transaction by the UC and BrazUSA occurred in May 2007, at which time the UC met with Andrea and Alessandra and gave them $15,000 of purported drug proceeds (actually official government funds) to be wired to an undercover bank account in Texas. Four days later, the UC received confirmation of the wire transfer. A second wire transfer of $26,000 to the undercover bank account also occurred in May 2007. A discussion

---

[3] For obvious reasons, the identity of the UC is not revealed in the complaint.  This includes the sex of the UC, for whom the Plaintiff used both the masculine and feminine pronouns.  For simplicity's sake, the Court shall use the masculine pronouns when referring to the UC in this decision.

about the possibility of the UC sending money to Brazil took place at this meeting and the UC was advised that wire transfers to Brazil would incur a 6% commission fee.

In June 2007, the UC met with Andrea to wire transfer $50,000 of purported drug proceeds to an undercover bank account and discussed wiring money to Brazil. He also asked to speak to Nilander DeOliveira to ensure he was comfortable wiring drug proceeds. Later in June 2007, the UC met with Nilander and discussed the process of wire transferring to Brazil. Nilander informed the UC of his commissions and advised the UC that the money does not actually leave the United States. In July 2007, the UC met with Andrea and Alessandra at BrazUSA and gave them another $50,000 to wire to an undercover bank account. In October 2007, the UC met with Andrea at a Dunkin' Donuts in Danbury, at which time she advised the UC that she wanted to do business with him again. The UC told Andrea he would get back to her.

During the course of the investigation, it was discovered that almost all of the transactions from Andrea's account in July 2007 went to a Citibank account in the name of Western Liability Management, Inc. From July 31, 2007, through August 24, 2007, Andrea's transfers to the WLM account totaled $254,819.00. In August 2007, Andrea opened an account at Union Savings Bank, which has branches in Connecticut, in the name of

BrazUSA, and from August 2007 to February 2008 a total of $3,136,690.00 was wire transferred from the BrazUSA account at Union Savings Bank to the WLM account at Citibank, N.A.

**B. Danbury Investigation**

In August 2007, an undercover law enforcement officer ("UC")[4] met with Amaral and Texeira at RM Insurance and informed them that he wished to wire drug proceeds domestically. Amaral and Texeira acknowledged that the money represented drug proceeds and Amaral stated that it is "ok, as long as you're not killing anyone." The UC gave Amaral $20,000 of purported drug proceeds (actually official government funds) to wire to an undercover bank account in Texas. Three days later, the UC received confirmation of the transaction from Amaral. In September 2007, the UC again met with Amaral and Texeira at RM Insurance and gave them $100,000 to wire to the undercover account. While counting the money, Amaral noted that the money smelled like marijuana and suggested that the UC deodorize the money. Amaral also indicated that it would be preferable to wire the money in increments of $50,000. Amaral told the UC that her favorite method of wiring money to Brazil was as follows: a middleman cultivates contacts that need to pay an invoice in the

---

[4] The complaint does not state whether this is the same undercover officer from the BrazUSA investigation in Bridgeport. In any event, the Court shall continue to use the masculine pronoun for this undercover officer for the same reason stated in footnote 1.

United States; the Brazilian contact pays the middleman in Brazilian currency; and the payment from the contact to the middleman satisfies the wire remittance from RM insurance. In this way, no dollars actually leave the United States and no Brazilian currency leaves Brazil. Within the next five days, the UC received confirmation of two separate $50,000 wire transfers from Marrakesh to an account provided by the UC.

Later in September 2007, the UC gave Amaral $50,000 to wire to the undercover account. In October 2007, the UC met with Amaral and Texeira at RM Insurance and gave them $25,000 to wire to the undercover account. At this meeting, Amaral, Texeira, and the UC discussed the UC's purported drug business and money laundering in general. Five days later, the UC received a confirmation of the transfer of $25,000 from the Marrakesh account to the account provided by the UC.

In November 2007, the UC again met with Amaral and Texeira and gave them another $25,000 to wire to the undercover account. The use of a middleman was once again discussed at this meeting. In January 2008, the UC met with Amaral and Texeira and gave them $15,000 to transfer to the undercover account. They also discussed the fees and commission to transfer to Brazil. At that time the fee was five dollars plus three to four percent of the funds sent to Brazil.

During the course of the investigation, it was discovered that Amaral and Texeira began using an account in the name of Marrakesh to wire money and that from August 2007 to February 2008, $343,530.00 was wired from the Marrakesh account to a Citibank, N.A. account in the name of WLM, a California corporation not registered as a money service business with FinCEN or with the State of California.

**C. Seizure of Defendant Currency**

As a result of Marrakesh's wire transfers, on March 17, 2008, law enforcement officers executed search and seizure warrants on the contents of the WLM account (Account Number 202252771 at Citibank, N.A.) not to exceed $343,530.00. Ultimately, $343,530.00 was seized from the WLM account.

As a result of BrazUSA's wire transfers, on March 17, 2008, law enforcement officers executed search and seizure warrants on the contents of the WLM account (Account Number 202252771 at Citibank, N.A.), not to exceed $3,136,690.00.  Ultimately, $485,892.42 was seized from WLM's account.

The total seized from WLM's account number 202252771 is $829,422.42. Accordingly, Defendant currency is composed of $343,530.00 obtained from the Marrakesh seizure and $485,892.42 obtained from the BrazUSA seizure.

After executing the search and seizure warrants, the United States confirmed that RM Insurance d/b/a Marrakesh and BrazUSA

wired a total of $4,144,520.00 between July 2007 and March 2008, of which approximately $261,170.00 was wired from Andrea DeOliveira's account, $491,860.00 from Marrakesh, and $3,391,490.00 from BrazUSA.

In October 2008, Monica Teixeira, Renata Amaral, Nilander DeOliviera, and Andrea DeOliveira pled guilty to violations of Section 1960, i.e., knowingly operating a money transmitting business affecting interstate and foreign commerce, which was not licensed under state law when the law so required.

### D. Investigation of Western Liability Management

WLM opened an operational account at Citibank, Account Number 202252771, for the purpose of obtaining and transmitting wire transfers.  From June 2007 through March 17, 2008, WLM was not registered as a money services business, nor did it obtain a license from the State of California to operate as a money services business, nor was it licensed with FinCEN.  During an interview with law enforcement officers after the seizure of $829,422.42, Ariston DeOliveira, the sole owner of WLM, acknowledged that he operated a business which accepted funds by wire transmission. He further stated that he did not know who was depositing money into his Citibank Account Number 202252771 and made no effort to determine the identify of those making deposits into that account. It was only after the seizure of the Defendant currency that WLM registered with FinCEN.

Documentation supplied by WLM indicates that many of the outgoing wire transmissions were sent to bank accounts for entities with addresses outside the United States. The funds were wired into and out of Citibank Account Number 202252771 at the direction of Attorney Carlos Ergas in Brazil.  Mr. DeOliveira only dealt with clients that were Mr. Ergas's international business clients.  Mr. DeOliveira would not directly contact the sources of the funds, but rather would contact Mr. Ergas or his employees to obtain directions on where to send the funds. According to Mr. DeOliveira, WLM had no interaction or relationship with the entities who wired in funds or to whom funds were transmitted, but merely acted as the middleman in these transactions. As a result of its services, WLM would receive a commission from Mr. Ergas.

By way of a letter dated October 2, 2009, counsel for WLM contacted the California Department of Financial Institutions ("DFI") to request a ruling by DFI that because WLM was not "in the business of receiving money for the purpose of transmitting the same or its equivalent to foreign countries," (doc. # 90, at 14), DFI would not take enforcement action against WLM if WLM did not obtain a license for the transmission of money abroad. On October 27, 2009, Robert Venchiarutti, Deputy Commissioner of DFI, issued a warning that WLM must "cease and desist from receiving money in this state for the purpose of transmitting

the same or its equivalent to foreign countries" without first obtaining a license as required by California law, i.e., "Financial Code Section 1800.3," as well as applicable federal law. (*Id.* at 2).

On November 23, 2009, DFI referred the WLM file to the California Attorney General's Office for criminal investigation under California Financial Code Section 260 because it appeared that WLM was engaged in receiving money and transmitting it to foreign countries in violation of California law. That referral also noted that Deputy Commissioner Venchiarutti believed that WLM was "a participant in the Brazilian doleiro currency market, a parallel or black market for the exchange of Brazilian real into other currencies." (*Id.* at 12).

WLM ceased operations in the fall of 2009, but still exists as a corporation, waiting to resume operations.

## II.  DISCUSSION

Pending before the Court is the Claimant's Motion for Summary Judgment and the Plaintiff's Motion to Dismiss WLM's claim, or in the Alternative, for Summary Judgment. The Plaintiff alleges that the Claimant WLM lacks standing, there is no genuine issue of material fact regarding the Defendant Currency's involvement in a violation of 18 U.S.C. § 1960, and the Claimant cannot prove that it is the innocent owner of the Defendant Currency.  The Claimant alleges that the Plaintiff

cannot show that the Defendant Currency was involved in a violation of 18 U.S.C. § 1960 and that the Claimant is the innocent owner of the Defendant Currency.

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It is the moving party's burden to demonstrate "that there are no genuine issues of material fact and that [it] is entitled to judgment as a matter of law." *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).

Summary judgment is not defeated by "the mere existence of *some* alleged factual dispute between the parties"; rather "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is material if proof of its existence might affect the outcome of the case. *Id.* at 248. A dispute between the parties about a material fact genuine only if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Id.*

14

**B. STANDING**

In civil forfeiture cases, the issue of standing should be resolved as a threshold determination, because if the claimant lacks standing, the court lacks jurisdiction to consider the challenge of the forfeiture. *See United States v. One 1982 Porsche 928*, 732 F. Supp. 447, 451 (S.D.N.Y. 1990). It is the claimant's burden of proof to demonstrate standing. *Mercado v. U.S. Customs Service*, 873 F.2d 641, 644 (2d Cir. 1989). Standing to challenge a forfeiture is a question of law to be determined by the court. *United States v. $557,933.89, More or less, in United States Funds,* 287 F.3d 66,78 (2d Cir.2002).

While at the initial pleading stage, the claimant "need not prove the full merits of [his] underlying claim,"*id.,* at the summary judgment stage, the government is allowed to challenge the claimant's legitimacy based on information obtained during discovery. *See United States v. United States Currency in the Sum of One Hundred Eighty-Five Thousand Dollars*, 455 F. Supp. 2d 145, 152 (E.D.N.Y. 2006).

There exist two different forms of standing in a forfeiture case: Article III standing and statutory standing. *United States v. Cambio Exacto, S.A.,* 166 F.3d 522, 526 (2d Cir. 1999). *United States v. 5 S 351 Tuthill Rd.,* 233 F.3d 1017, 1021 (7th Cir. 2000). The claimant contesting forfeiture must first establish Article III standing by demonstrating a sufficient

interest in the property.  *United States v. U.S. Currency in the amount of $103,387.27*, 863 F.2d 555, 560, n.10 (7th Cir. 1988. Bare legal title may be insufficient to demonstrate an ownership interest in property absent other evidence of dominion or control.  *One 1982 Porsche 928*, 732 F. Supp. at 451.  Indeed, "[a] search for standing in civil forfeiture cases looks beyond the formal title to determine whether the record owner is the 'real' owner or merely a 'strawman' set up either to conceal illegal dealings or to avoid forfeiture."  *Id.*

Concerns arising from "'straw man' transfers of currency, in which a criminal defendant transfers property to a third party, who, in turn, asserts ownership over Defendant Funds and attempts to circumvent government seizure of the proceeds of illegal activities," have led to the requirement that a claimant demonstrate more than "naked possession" or "mere physical possession" in order to demonstrate standing.  *United States v. Currency $716,502.44*, No. 08-CV-11475, 2008 U.S. Dist. LEXIS 107357, at *13 (E.D. Mich. Dec. 5, 2008).  In a civil forfeiture case, a "naked claim of possession" is not sufficient to confer standing.  *Mercado*, 873 F.2d at 645.

A claimant's standing in a civil forfeiture case depends on three elements: "(1) an immediate threat of injury; (2) fairly traceable to the [government's] conduct; that (3) a favorable federal court decision likely would redress or remedy." *United*

*States v. 5 S 351 Tuthill Rd.,* 233 F.3d 1017, 1022 (7th Cir. 2000). Although "ownership and possession generally may provide evidence of standing, it is the injury to the party seeking standing that remains the ultimate focus. It is because of the lack of proven injury that we have, for example, denied standing to 'straw' owners who do indeed 'own' the property, but hold title to it for somebody else." *Cambio Exacto, S.A.,* 166 F.3d at 527.

WLM maintains it has Article III standing to challenge the instant forfeiture because it was the owner of Defendant currency, it had possession at the time of the seizure, and it was directly injured by the wrongful taking. The Plaintiff argues that where ownership is obtained through a transfer that violates applicable state fraudulent transfer laws, the claimant lacks standing.  WLM, in its Memorandum of Law in Opposition to USA's Motion to Dismiss, or in the alternative, for Summary Judgment, characterizes the Plaintiff's argument as "nonsensical and unpersuasive," (doc. # 85, at 4), but fails to cite any legal authority to support its position. The Court's threshold determination of standing cannot be so quickly dismissed.

It is undisputed that WLM is the owner of Citibank Account Number 202252771 and that the Defendant Currency was seized from that account.  However, in the context of forfeitures, "it is settled law that possession of bare legal title by one who does

not exercise dominion and control over the property is insufficient to establish standing to challenge a forfeiture." *United States v. New Silver Palace Restaurant, Inc.*, 810 F. Supp. 440, 444 (E.D.N.Y. 1992)(internal quotation marks omitted).

The rationale for the rule that bare legal title may be insufficient to establish standing is that appearances may be manipulated and deceptive, especially with regard to illegal operations.  It has been recognized that people engaged in illegal activities, especially when needing to conceal illegitimate funds and being aware of forfeiture statutes, often attempt to disguise their interest in property by not placing title in their own names.  *See United States v. One 1977 36 Foot Cigarette Ocean Racer*, 624 F. Supp. 290, 294-95 (S.D. Fla. 1985).  An analysis of standing in civil forfeiture cases looks beyond the formal title to determine whether the record owner is the "real" owner or merely a "straw man" set up to either conceal illegal dealings or to avoid forfeiture.

In the instant case, WLM failed to demonstrate, by a preponderance of the evidence, an interest in the seized property sufficient to satisfy the Court that it has standing. Specifically, the evidence demonstrates that WLM did not have the power to make unilateral decisions about the Defendant Currency. To the contrary, according to Mr. Ariston, the sole

owner of WLM, all decisions about the funds in WLM's Citibank Account Number 202252771 were made by, or on behalf of, Mr. Ergas, not WLM. Pursuant to an agreement between Mr. Ariston and Mr. Ergas, WLM would be advised by someone "working for [Mr. Ergas] or working for his clients" that a deposit was going to be made into WLM Citibank Account 202252771. (Ex. 1 to Plaintiff's Rule 56(a)(1) Statement, Dep. of Ariston DeOliveira, p. 65:10-11). Pursuant to that same agreement between Mr. Ariston and Mr. Ergas, WLM would then "turn around and then direct the wire out to wherever it had been told to send the money." (*Id.* at 71:9-10). The practice of WLM was to turn around and pay the money out on the "same business day" on which that money had been deposited in WLM Citibank Account 202262771. (*Id.* at 71:4).

In this regard, the Claimant is merely a "nominal" owner, without any controlling interest in the Defendant Currency. Specifically, the Claimant would receive explicit instructions from, or on behalf of, Mr. Ergas about when funds would be deposited, and then where to send those funds. The Claimant could not even transfer additional funds to cover any expenses until Mr. Ergas so approved. These facts demonstrate that the Claimant did not exert dominion or control over the funds in Citibank Account Number 202252771, and thus it lacks Article III standing to challenge the forfeiture.

### C. FORFEITURE

The Court further finds that even if the Claimant had been able to establish standing, the Defendant Currency would be subject to forfeiture. If a claimant successfully demonstrates standing, the burden shifts to the government to show by a preponderance of the evidence that the property at issue is subject to forfeiture. 18 U.S.C. § 983 (c)(1). If the government makes such a showing, the burden shifts to the claimant to establish by a preponderance of the evidence that it is an "innocent owner" of the seized property. 18 U.S.C. § 983 (d); *see United States v. $21,510.00 in United States Currency*, 292 F. Supp. 2d 318, 320 (D. Puerto Rico 2003).

### Involvement of the Defendant Currency in Illegal Conduct

Section 1960 was enacted by Congress "in response to concerns that nonbank financial institutions (money transmitters, check cashers, and foreign exchange dealers) were increasingly being used to transfer the proceeds of illegal activity." *United States v. Dimitrov*, 546 F.3d 409, 413 (7th Cir. 2008). Section 1960 prescribes criminal penalties for "[w]hoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business . . . ." 18 U.S.C. § 1960(a).  The statute defines "unlicensed money transmitting business" as "a money transmitting business which affects interstate or foreign

commerce in any manner or degree and - - (A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable; (B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or (C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity."  18 U.S.C. § 1960(b)(1).  The term "money transmitting" is defined under the statute as "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."  18 U.S.C. § 1960(b)(2).

Proof that money was delivered for transmission overseas and that the money was in fact so transmitted is evidence of a violation of Section 1960. *See United States v. Bah*, 574 F.3d 106, 115 n.7 (2d Cir. 2009).  The Second Circuit has upheld convictions under Section 1960 where the defendants "knew that the business was engaged in money-transmitting and also knew that the business had no money-transfer license," whether or not

they also knew that a license was required. *United States v. Elfgeeh*, 515 F.3d 100, 133 (2d Cir. 2008).

The conduct in the instant case falls squarely in line with the conduct Congress intended to prohibit by enacting section 1960. WLM knowingly operated an unlicensed money service business that transmitted funds which affected interstate or foreign commerce. During the period of investigation, WLM knowingly accepted and transmitted funds via wire transfers, despite the fact that it was not licensed to do so. Documentation supplied by WLM indicates that many of the outgoing wire transmissions were sent to bank accounts for entities with addresses outside the United States. Ariston DeOliveira, the owner of the Claimant WLM, acknowledged that WLM's business objective was to receive and obtain wires of funds from various sources in the United States for the purpose of transferring funds via wire transfers to bank accounts of various entities. Despite the clear objective of WLM to act as a money transmitting business, Mr. DeOliveira did not obtain a license with the State of California, or the Department of the Treasury. Even if Mr. DeOliveira claimed he was unaware that a license was required to act as a money transmitting business, ignorance of licensing requirements is immaterial for the purposes of Section 1960. *See Dimitrov*, 546 F.3d at 414.

**Innocent Owner Defense**

Pursuant to 18 U.S.C. § 983(d)(1), "[a]n innocent owner's interest in property shall not be forfeited under any civil forfeiture statute." The first step for a claimant to establish the innocent owner defense is to prove that it is an "owner" within the meaning of 18 U.S.C. § 983(d). *See United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1014 (8th Cir. 2003). "As relevant here, the statute defines the term 'owner' to include 'a person with an ownership interest in the specific property sought to be forfeited,' and to exclude 'a nominee who exercises no dominion or control over the property.'" *Id.* (quoting 18 U.S.C. § 983(d)(6)). Even a claimant who demonstrates Article III standing may fail to prove an ownership interest that satisfies the statutory criteria for purposes of the innocent owner defense. *Id.* For the same reasons articulated in the discussion of the standing issue, the Court finds that the Claimant, which did not exert dominion or control over the funds in Citibank Account Number 202252771, has failed to prove an ownership interest that satisfies the requirements of 18 U.S.C. § 983(d). Consequently, the Claimant cannot qualify as an innocent owner.

Even if WLM had established an ownership interest that satisfied the requirements of 18 U.S.C. § 983(d), it could not be the innocent owner of the Defendant Currency, because it

ignored illegal activities of which it reasonably should have known. Specifically, an owner who has engaged in willful blindness as to the activities occurring with the property is not entitled to the protection of the innocent owner defense. *See United States v. 755 Forest Road*, 985 F.2d 70, 72 (2d Cir. 1993)("where an owner has engaged in 'willful blindness' . . . her ignorance will not entitle her to avoid forfeiture").

WLM was not, nor did it attempt to become, aware of who wired money into its accounts, how much was being wired, nor the businesses of the entities into whose accounts it transferred funds. It was not until after the seizure of Defendant that the Claimant registered with FinCEN. Mr. DeOliveira, the sole owner of WLM, was a businessman with years of experience in the banking industry. Given these facts, the Court concludes that the Claimant engaged in willful blindness as to the activities occurring with the property. For this additional reason, the Claimant is not entitled to the protection of the innocent owner defense.

## III. CONCLUSION

For the foregoing reasons, the Claimant's Motion for Summary Judgment **(dkt. # 70)** is denied, and the Plaintiff's Motion to Dismiss, or in the alternative, for Summary Judgment **(dkt. # 81)** is granted. The Defendant, $829,422.42 in United States currency, is ORDERED forfeited to the United States of

America for disposition in accordance with the law.

The Clerk of the Court shall close this file.

        **SO ORDERED** this 5th  day of June, 2013.


        /s/ DJS
_____
            **DOMINIC J. SQUATRITO**
        **UNITED STATES DISTRICT JUDGE**